**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HIGHTOWER HOLDING, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **Case Number: _____** |
| | § | |
| **LARS KNUDSEN,** | § | |
| | § | |
| *Defendant.* | § | |

**ORIGINAL COMPLAINT AND APPLICATION
FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION**

Plaintiff Hightower Holding, LLC, ("Hightower" or "Plaintiff"), by its undersigned counsel, hereby files this Original Complaint and Application for Injunctive Relief in Aid of Arbitration against Defendant Lars Knudsen ("Knudsen" or "Defendant") and states as follows:

## I.  NATURE OF ACTION

1.      Hightower brings this action for injunctive relief in aid of arbitration against Defendant Knudsen, an investment advisor who sold his business to Hightower.  As a material term of Hightower's acquisition of a share of Knudsen's business, Knudsen agreed to certain post-sale restrictions on activities which were designed to protect Hightower from unfair competition, and to protect Hightower's investment in the business it acquired from Knudsen.  Knudsen is currently in violation of those post-sale restrictions, and further substantial breaches of these restrictions by Knudsen are imminent.  Accordingly, Hightower seeks injunctive relief from this Court to preserve the status quo pending arbitration and stop the ongoing irreparable harm it is currently suffering.

2.     Hightower provides financial advice and services to its clients across the United States.  In December of 2018 and January of 2019, Hightower and Knudsen executed a series of transactions through which Knudsen and his partners (collectively, the "Partners")[1] formed a partnership, Hightower Bellevue Advisors, LLC, a Delaware limited liability company ("HT Bellevue Advisors"), to oversee and manage the wealth management and investment advisory business through which Hightower provides financial services to end clients of the Hightower business unit operating under the trade name "Hightower Bellevue".  The Partners, the sole members of HT Bellevue Advisors, then sold a stake in that business to Hightower (the "Acquisition").  The Partners received valuable consideration for the Acquisition and were compensated not only for the sale of the business, but also for a related procurement of client goodwill.

3.     In conjunction with the Acquisition, and as a material term to the sale, Knudsen signed a Standard Protective Agreement (Sale-Based) ("SPA")[2] which contains, *inter alia*, non-solicitation, non-hire, non-interference, and non-compete restrictive covenants (together, the "Restrictive Covenants"), as well as non-disclosure provisions related to the use of confidential information. As consideration for the Acquisition, Knudsen received not only substantial monetary and equity compensation, but also access to confidential and proprietary Hightower information.

4.     Following an internal investigation conducted in late 2023 and early 2024, Hightower learned that Knudsen was engaged in a scheme of self-dealing and corrupt diversions of funds rightfully belonging to Hightower (and his Partners), as well as a scheme of charging personal expenses to Hightower and improperly allocating client fees. The investigation also revealed that a series of ongoing behavioral issues, including a pattern of severe verbal abuse and

---

[1] The Partners are Knudsen, Dan Stober, and Randall Williams-Gurian.
[2] The SPA, executed January 2, 2019, is attached as hereto Exhibit 1A.

2

bullying of Hightower Bellevue's employees, resulting in the creation of a hostile work environment. Accordingly, Hightower terminated Knudsen on February 26, 2024.

5.     While Hightower's investigation into Knudsen was ongoing, Knudsen requested and received a Hightower client list, including confidential contact information. Since being terminated, Knudsen has been using this list to contact Hightower clients, disparage Hightower, and telling clients to delink their accounts or otherwise cease working with Hightower. Hightower has also learned that Knudsen is in the final stages of becoming affiliated as an investment adviser with Hohimer Wealth Management ("Hohimer"). Knudsen's removal and use of Hightower's trade secret and confidential information and his imminent affiliation with a direct Hightower competitor violate the clear terms of the SPA. Moreover, Knudsen's misappropriation of the client list violates the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*. Both the SPA and the DTSA provide for injunctive relief to protect Hightower's interests.

6.     Knudsen has already caused harm to Hightower by, *inter alia*, (a) misappropriating Hightower's trade secrets in violation of the DTSA, (b) breaching valid and enforceable post-affiliation restrictive covenants, and (c) interfering with Hightower's current and prospective business relationships. Additionally, Knudsen's malfeasance is ongoing and constitutes a continuing and imminent threat of irreparable harm to Hightower.

7.     Thus, Hightower seeks injunctive relief from this Court: (i) enjoining Knudsen from further breaches of his contractual obligations; (ii) requiring Knudsen to return all confidential information and trade secrets to Hightower; and (iii) prohibiting further use by Knudsen of Hightower's trade secret and confidential information. This preliminary injunctive

relief is intended to maintain the status quo until Hightower's substantive claim for damages can be adjudicated in American Arbitration Association ("AAA") arbitration as required by the SPA.[3]

## II.  THE PARTIES

8.     Plaintiff Hightower Holding, LLC is a limited liability company organized under the laws of the State of Delaware and headquartered in Illinois.  Its members are Hightower Intermediate, LLC, a Delaware limited liability company, and Hightower Intermediate Corp., a Delaware corporation.

9.     Defendant Lars Knudsen is an individual who resides in the state of Washington.

## III.  JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this matter is a civil action arising under the Constitution, laws, or treaties of the United States.  This action is based on 18 U.S.C. § 1836, also known as the Defend Trade Secrets Act. Additionally, this Court has supplemental jurisdiction over Hightower's state law and other claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Hightower's DTSA claim that they form part of the same case or controversy.

11.     Venue is proper in this district.  Paragraph 12(g) of the SPA states that "Hightower may seek injunctive or other equitable relief with respect to any violation of this Agreement in the Chosen Courts in lieu of or in addition to seeking arbitration in accordance with Section 12(f)."[4] Section 12(f) of the SPA defines the term "Chosen Courts": "Each party to this Agreement irrevocably submits to the non-exclusive jurisdiction and venue in the state or federal courts of the United States of America located in the State of Illinois . . . in connection with . . . any proceeding

---

[3] Ex. 1A, pp. 13-14 ¶ 12(f).
[4] Ex. 1A, p. 14 ¶ 12(g).

seeking an injunction or other equitable relief in accordance with Section 12(g)."[5] "Hightower may seek injunctive or other equitable relief with respect to any violation of this Agreement in the Chosen Courts [defined as Illinois state and federal courts in paragraph 12(f)] in lieu of or in addition to seeking arbitration[.]"[6] Two other executed agreements between Knudsen and Hightower relevant to this matter, the Partnership Services and Affiliation Agreement ("PSAA") and the Unit Purchase Agreement ("UPA"), contain similar terms.[7]

12.     The SPA further provides that its interpretation, "and all issues, matters, suits, disputes, controversies and determinations regarding enforceability, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without reference to any conflict of law principles that would result in the application of the law of any other jurisdiction."[8]

## IV.  FACTS COMMON TO ALL COUNTS[9]

**A.     Hightower acquired an interest in Knudsen's Bellevue business.**

13.     Prior to his affiliation with Hightower, Knudsen founded Triad Wealth Stewardship, LLC ("Triad"), a wealth management and investment advisory business.  In 2014, Knudsen transitioned his Triad business to Hightower, along with its client relationships and accounts, in exchange for substantial cash and equity compensation.  As a result of this transition, Knudsen provided financial services to Hightower clients through Hightower Advisors, LLC, a Hightower subsidiary ("HTA").  Knudsen became a Managing Director and executive leader of Hightower's Bellevue, Washington branch.

---

[5] Ex. 1A, p. 13 ¶ 12(f).
[6] Ex. 1A, at ¶¶ 12(f) and (g).
[7] The UPA, attached hereto as Exhibit 1C, provides: "[a]s to any suit or action arising under or related to this Agreement      . . . the parties (a) agree that the suit or action must be brought and litigated in, and decided by, the state or federal courts in Chicago, Illinois[.]" The PSAA, attached hereto as Exhibit 1B, similarly provides: "[a]s to any suit or action arising under or related to this Agreement that is not subject to mandatory arbitration . . . ."
[8] Ex. 1A, p. 13 ¶ 12(e).
[9] The facts pled in this section are verified by the Declaration of Randall Williams-Gurian, attached hereto as Exhibit 1.

14. On December 31, 2018, Knudsen resigned from his position at Hightower along with his Partners. Together, they established HT Bellevue Advisors, a Delaware limited liability company of which they were the sole members.

15. At or around the same time, Hightower transacted with the Partners via an asset purchase and the post-closing implementation of a partnership structure between the Partners and Hightower. Through a Contribution and Exchange Agreement dated January 2, 2019 (the "CEA"),[10] Knudsen (as well as the other Partners) assigned, transferred, conveyed, and contributed to HT Bellevue Advisors: (i) all of his personal and ongoing business relationships with clients and key businesses, as well as his experience and reputation that comes from his personal, direct and intimate involvement in interacting with clients and other key business relations; and (ii) all of his rights with respect to client management fees and commissions. In exchange, Knudsen and the Partners received partnership units in HT Bellevue Advisors.

16. HT Bellevue Advisors was formed as a business enterprise through which the Partners would manage and oversee the operations of the Hightower Bellevue business while delivering financial services to Hightower clients as investment advisor representatives of HTA. All of the clients serviced by Knudsen (and the Partners) on behalf of Hightower remained under investment advisory agreements with HTA, and all account assets of such clients remained at Hightower's asset custodial firms. All of the data, books, records, and other information relating to clients serviced by Knudsen (and the Partners) remained the property of Hightower. This relationship is memorialized in the PSAA dated December 31, 2018.[11]

17. On January 2, 2019, Hightower purchased a portion of the partnership units of HT

---

[10] A true and correct copy of the CEA is attached hereto as Exhibit 1D.
[11] Ex. 1B.

Bellevue Advisors from the Principals through the UPA,[12] acquiring an interest in the HT Bellevue Advisors' business. In exchange for this Acquisition, Knudsen was compensated with nearly $900,000 in cash and more than 200,000 units of Hightower equity. The UPA further provided for specific future purchases of HT Bellevue Advisors' interests by Hightower in exchange for substantial additional consideration. Between the initial UPA transaction and subsequent transactions, the Partners formed a holding company, HTB Holdings, LLC, a Delaware limited liability company, of which Knudsen is the indirect majority owner and managing member. Two such additional purchases occurred on or about March 31, 2020, and August 6, 2021, through which the Partners received an additional aggregate amount of more than $3,500,000 in cash and more than 250,000 additional Hightower units, the majority of which was further distributed to Knudsen as the indirect majority owner of HTB Holdings, LLC.

**B.     Knudsen is Bound by Restrictive Covenants that Prohibit him from Competing with Hightower.**

18.     As material consideration for the partial acquisition of HT Bellevue Advisors, and to protect Hightower's investment in HT Bellevue Advisors' business, the Partners were required to execute the SPA.[13] The SPA provides for post-sale restrictions on competition, solicitation, and the use of confidential information, among other things. The preamble of the SPA provides that Hightower considered the goodwill and retention of confidential information to be valuable assets and an essential inducement to the execution of the aforementioned agreements and the consummation of the transactions contemplated therein (the Acquisition).[14] The preamble of the SPA further provides that: (i) Knudsen agrees that he could substantially dilute the value of such goodwill and confidential information by competing with Hightower or soliciting or hiring

---

[12] Ex. 1C.
[13] Ex. 1A. Collectively, the SPA, PSAA and UPA will be referred to as the "Transaction Documents."
[14] Ex. 1A, p. 1.

customers and/or employees of Hightower; (ii) Knudsen agreed to accept certain post-sale restrictions to induce Hightower to enter into the transaction; and (iii) Hightower would not have entered into the Acquisition absent Knudsen's agreement to accept those restrictions.[15]

19.     Knudsen received valuable consideration in exchange for signing the SPA. In addition to the substantial consideration received through the Transaction, Knudsen received specialized training, licensing, and access to Hightower client accounts (and their associated confidential information) solely and exclusively because of his affiliation with Hightower. Knudsen also benefitted from Hightower's marketing campaigns and its reputation in the financial services industry.

20.     Through the SPA, Knudsen represented, among other things, that: (i) by virtue of his relationship with Hightower, he has received or has been granted access to confidential information, as well as special knowledge of Hightower's relationships with its brokers, financial advisors, customers, and prospective customers; (ii) through the Acquisition, he would receive substantial cash payments and other valuable consideration; (iii) Hightower has invested and will invest time, expense, and significant effort to develop long-term relationships with its brokers, financial advisors, customers, and prospective customers; (iv) those relationships are and will continue to be valuable, special and unique assets of Hightower; (v) Hightower would not have consummated the Acquisition absent Knudsen's execution of the SPA; (vi) the post-sale restrictions in the SPA and discussed further herein are necessary and reasonable in order to protect Hightower's proprietary interests, goodwill, workforce, relationships, and confidential information; (vii) a breach by Knudsen of any of his covenants or restrictions in the SPA will result in irreparable harm and damages that cannot be adequately compensated by a monetary award and,

---

[15] *Id.*

accordingly, Hightower will be entitled to injunctive relief or other equitable relief to prevent or redress and such breach (without posting a bond or other security); (viii) the duties and obligations imposed on Knudsen under the SPA are fair and reasonable and will not prevent him from earning a comparable livelihood necessary to support him and his dependents, and the potential harm to Hightower of non-enforcement of the SPA outweighs any harm to Knudsen by enforcement through injunction or otherwise; and (ix) Knudsen has consulted with legal counsel regarding the covenants and restrictions contained in the SPA and, based on such consultation, agrees that the covenants and restrictions in the SPA are reasonable in terms of duration, scope and area, and are necessary to protect the substantial goodwill of Hightower.[16]

21.    To protect Hightower's investment in the HT Bellevue Advisors' business, the SPA contains post-sale restrictive covenants related to competition, confidential information, and post-termination interactions with Hightower's current and prospective clients and employees.  By signing the SPA, Knudsen acknowledged that he was prohibited from competing against Hightower or soliciting any of Hightower's clients or employees for a period of time, and from retaining or using any Hightower client information should she cease to be affiliated with Hightower.  Specifically, he agreed to the following:

- "At all times following the date hereof, [Knudsen] shall (i) hold the Confidential Information[17] in the strictest confidence and take all reasonable precautions, including following all Hightower policies and directives, to prevent the disclosure of Confidential Information […] and (ii) not disclose or otherwise use the Confidential Information in any manner or medium whatsoever, except as required to perform [Knudsen's] duties for Hightower[.]"[18]

---

[16] Ex. 1A, pp. 2-3 § 1.
[17] Ex. 1A, pp. 5-6 § 3(a) (Defining "Confidential Information" as including but not limited to documents relating to "financial matters, regulatory matters, business, planning, operations, products or services, potential products or services . . . organization charts, formulas, proposals, outlines, business plans […] Customers, Prospective Customers . . . and any other competitively sensitive or proprietary information")
[18] Ex. 1A, p. 6 § 3(c).

- "Ownership. As between Hightower […] and [Knudsen], Hightower is and shall remain the exclusive owner of all rights, title, and interest in and to the Confidential Information."[19]

- "During the term of the Partner Arrangements[20] and for a period ending on the date that is the later of (i) 24 months immediately following the voluntary or involuntary termination of the Partnership Arrangements applicable to [Knudsen] for any reason and (ii) 48 months following the date of the last payment to [Knudsen] under the Transaction Agreement (the "Restricted Period") [… Knudsen] shall not, directly or indirectly, on [Knudsen's] own behalf or on behalf of any other person, except on behalf of Hightower in furtherance of [Knudsen's] proper duties to Hightower, in connection with any "Triad Permitted Activities"[21] […] or as expressly required to comply with any rule, regulation nor code of conduct promulgated by the SEC, FINRA, the CFP Board or any state or federal regulatory entity"[22] do any of the following:

  - "contact, request, solicit, encourage or provide services to, or assist any Person in contacting, requesting, soliciting, encouraging or providing services to any Person who is (or was during the Restricted Period or during the twelve (12) month period preceding such action) […] [a] recruit, Customer, [or] Prospective Customer […] of Hightower or the Partner Firm (ii) entering into any agreement, engagement or opportunity to provide any such products, services and/or advice to any Protected Business Contact, (iii) accepting or receiving any transfer or assets, accounts or confidential or personal information related to any Protected Business Contact and/or (iv) inducing any Protected Business Contact to cease doing business with or reduce the level of business it does with Hightower or the Partner Firm."[23]

  - "(i) request, solicit or encourage, or assist any Person in requesting, soliciting or encouraging, or accept or assist any Person in accepting if offered with or without solicitation, the employment or services of any Person who is (or was during the Restricted Period or during the twelve (12) month period preceding such action or acceptance) an employee, independent contractor, financial advisor or broker of Hightower or the Partner Firm (or who is or was during the Restricted Period or during the twelve (12) month period preceding such action or acceptance the subject of Hightower's or the Partner Firm's recruitment efforts) (collectively, the "Protected Personnel"), (ii) request, solicit or encourage, or assist any person in requesting, soliciting or encouraging,

---

[19] Ex. 1A, p. 6 § 3(d).
[20] Defined in Ex. 1A, p. 1, as the relationship between Knudsen and Hightower resulting from the Transaction "and other arrangements governing the business relationships among such parties[.]"
[21] Defined in Ex. 1A, pp. 6-7 § 4, as using Triad as an insurance agency to sell life, disability and long-term care insurance to Hightower customers subject to certain conditions.
[22] Ex. 1A, pp. 6-7 § 4.
[23] Ex. 1A, p. 7 § 4(a).

any Protected Personnel to terminate such Person's employment or engagement with Hightower or the Partner Firm or (iii) hire or engage, agree to hire or engage or assist any other person in hiring or engaging the services of any Protected Personnel"[24]

- o "otherwise interfere with, reduce, or harm, attempt to interfere with, reduce or harm or assist any other Person in interfering with, reducing or harming Hightower's […] relationships with any Protected Business Contacts or Protected Personnel."[25]

- "During the Restricted Period, [Knudsen] shall not, directly or indirectly, on [Knudsen's] own behalf or on behalf of any other Person […] (i) own any interest in, manage, control, participate in, consult with or become engaged or involved in any Person engaged in or to engage in the Business within the United States or any other jurisdiction in which Hightower […] does business […] including by becoming an organizer, owner, co-owner, trustee, promoter, affiliate, investor, lender, partner, joint venturer, stockholder, officer, director, employee, consultant, licensor or advisor of […] or to engage in the Business […]" [26]

- "[Knudsen] acknowledges and agrees that all lists and information about any of Hightower's Customers and Prospective Customers (including, without limitation, the names, addresses, telephone numbers, and email addresses of all such Persons) are and shall remain the exclusive property of Hightower, regardless of whether such information was developed, purchased, acquired, or otherwise obtained by Hightower […] or [Knudsen]."[27]

- "[Knudsen] agrees that, during and after the term of the Partner Arrangements, [Knudsen] will not make any disparaging, untrue, or misleading written or oral statements about or relating to Hightower or the Partner Firm or their respective services or products (or about or relating to any Hightower or Partner Firm officer, board member, agent, employee, direct or indirect equityholder or other person acting on Hightower's or the Partner Firm's behalf) or any written or oral statement having the intended or foreseeable consequence of casting any of such persons in a bad light, or disparaging its or their business practices, competence, reputation, products, services or skills[.]"[28]

22. Moreover, the SPA contains Knudsen's agreement that injunctive relief would be appropriate to prevent irreparable harm that would be caused by breaches of any of the above:

---

[24] Ex. 1A, p. 7 § 4(b).
[25] Ex. 1A, p. 7 § 4(c).
[26] Ex. 1A, p. 8 § 5.
[27] Ex. 1A, p. 8 § 6(a).
[28] Ex. 1A, p. 9 § 7.

It is agreed that any breach or anticipated or threatened breach of any of [Knudsen's] covenants contained in this Agreement will result in irreparable harm and continuing damages to Hightower and its business and that Hightower's remedy at law for any such breach or anticipated or threatened breach will be inadequate, and Hightower will suffer damages that may be difficult to quantify at the time of violation, including costs associated with investigating, monitoring or remedying the misuse of Confidential Information; costs associated with maintaining, restoring or repairing Hightower's relationship with Customers […]. Accordingly, in addition to any and all other remedies that may be available to Hightower at law or in equity in such event […] Hightower shall be entitled to (i) specific performance, a temporary and permanent injunction or other equitable relief, without the necessity of Hightower posting bond or furnishing other security and without proving, damages or injury or the inadequacy of the available remedies at law, including any injunction or other equitable relief enjoining and restricting the breach or threatened breach of any such covenant or restraining [Knudsen] from using or disclosing, in whole or in part, any Confidential Information […].[29]

23.     The SPA provides that Knudsen is barred from contacting or soliciting Hightower clients, interfering with Hightower relationships, and competing against Hightower for "48 months following the date of the last payment to [Knudsen] under the Transaction Agreement" or, in the alternative, for 24 months "immediately following the […] involuntary termination of the Partnership Arrangements applicable to [Knudsen]"[30]  Final payment to Knudsen under the Transaction Agreements occurred on August 6, 2021, which would extend the restricted period through August 6, 2025.  In the alternative, the Partnership Arrangements were terminated with respect to Knudsen on February 26, 2024, meaning the restricted period runs through, at least, February 26, 2026.

24.     Knudsen expressly acknowledged that the SPA's restrictions are "reasonable and valid in all respects" and waived (and agreed not to raise) as a defense any issue of reasonableness in any proceeding to enforce any provision of the SPA.[31]

---

[29] Ex. 1A, pp. 11-12 ¶ 12(b).
[30] Ex. 1A, pp. 6-7 ¶ 4.
[31] Ex. 1A, p. 12 ¶ 12(d).

25.     By its terms, the SPA and "all issues, matters, suits, disputes, controversies and determinations regarding enforceability, shall be governed by, and construed in accordance with the laws of the State of Delaware, without reference to any conflict of law principles that would result in the application of the law of any other jurisdiction."[32]

## C.    Hightower Protects its Trade Secrets and Confidential Information.

26.     To protect itself from unfair competition, Hightower makes substantial efforts to ensure the confidentiality of information concerning its clients and strategies. In addition to the contractual safeguards discussed above, Hightower requires its personnel and affiliates to abide by policies and procedures that specifically treat client and proprietary information as Hightower property, and which prohibit the use or disclosure of this information other than in connection with Hightower's business. Moreover, Hightower maintains policies safeguarding client and proprietary information to protect clients' privacy interests and keep this information strictly internal so that it does not fall into the hands of Hightower's competitors. These policies prohibit providing client and proprietary information to any third party, or otherwise removing this information from Hightower, or otherwise misusing it. They further explicitly prohibit the use of Hightower's client and proprietary information in ways that are directly competitive with Hightower.

27.     Hightower derives actual and potential economic value from its client and proprietary information in part because this information is not generally known to and not ascertainable through proper means by other persons who can obtain economic value from its disclosure or use.  Hightower goes to great lengths and significant expense to maintain and grow its book of business, establish client relationships and trust, and acquire/develop the confidential

---

[32] Ex. 1A, p. 13 ¶ 12(e).

information it seeks to protect. These efforts include marketing, training its employees and affiliates, conducting extensive research and due diligence, and providing services that best fit the needs of its clients, all of which take time and money to accomplish.

28.     Hightower exerts significant efforts to maintain the secrecy and confidentiality of Hightower's client records, including information identifying its clients. Its Bellevue offices are locked and secure during non-working hours and a security firm monitors the building. The computer system is password-protected and only authorized Hightower personnel have access to account information. The highly sensitive and confidential client information that Hightower is required to maintain is kept secure on the Hightower network. Knudsen was undoubtedly aware of the steps taken by Hightower to protect its client and proprietary information.

29.     Hightower's customer and proprietary information is also protected by federal law and industry standards. For example, SEC Regulation S-P, 17 CFR § 248, provides for specific conditions under which investment advisors like Knudsen are permitted to disclose nonpublic personal information about clients. Generally, unless Knudsen sought and received approval for the specific disclosure from the client(s) at issue, such disclosure is prohibited.

**D.     Hightower's investigation into Knudsen revealed a troubling pattern of misconduct that ultimately led to his termination.**

30.     Knudsen had previously engaged in some insurance business through Triad while affiliated with Hightower. He initially shared insurance revenues with Hightower, but under the terms of the Transaction Documents described above, Hightower and HT Bellevue Advisors would share revenue under specified terms, and all insurance revenues would be excluded through Triad. Triad could provide insurance to Hightower clients, but all business with Hightower clients was required to be properly logged with compliance in accordance with Hightower policies and procedures. All other activities would require Hightower's express, written consent.

14

31.     A 2024 internal investigation revealed that from late 2020 through early 2024, approximately $600,000 of client fees ran through Triad but, due to Knudsen's improper use of deductions and categorization of these fees as "consulting" fees, which are still subject to the Transaction Documents, Knudsen was able to improperly divert approximately $235,600 rightfully belonging to Hightower instead to himself. He also failed to split these revenues with his Partners.

32.     The investigation also revealed that Knudsen improperly had Hightower cover expenses for activities completely unrelated to Hightower business.   When questioned, Knudsen admitted to the improper designation of personal expenses, but blamed his own staff for not being able to distinguish between his business and personal expenses.   The investigation, however, revealed that Knudsen has intimate knowledge of and designates his own expenses as business or personal. Other staff-members and partners have indicated that Knudsen routinely bills his personal expenses to the practice, and would feign ignorance and surprise when confronted, improve for a few months, then go back to the same problematic billing practices. Knudsen has claimed several expenses were for clients and when it was pointed out that client gifts must be tracked under applicable compliance policies, he expressed ignorance.

33.     He also regularly submitted expenses for client entertainment from a restaurant in a building his wife co-owns in Arizona, despite there being only one active Arizona client. He has admitted that his expenses were submitted and that he was reimbursed for several personal expenses.

34.     Knudsen also brought his loaded firearm into the Hightower Bellevue office on several occasions.   Knudsen was made aware that doing so violated Hightower Bellevue policies, but, again, he feigned ignorance.   Interviews with several staff members indicated that they were

15

aware Knudsen brought a firearm into the Hightower Bellevue office and that he discussed it often, admitting to one person that the sound she heard from outside his office had been his gun going into his holster. Other staff members have been present while his gun case was displayed in the room, including on the table during one termination conversation.

35.     As a result of the wrongdoing and inappropriate and improper behavior discovered through the internal investigation, Knudsen was terminated pursuant to the SPA and the PSAA on February 26, 2024.[33]  As of the termination of the relationship between Hightower and Knudsen, Knudsen was the lead advisor to or had a substantial relationship with client accounts totaling more than $350 million in assets under management.

**E.     Knudsen misappropriates Hightower trade secrets and violates his contractual obligations to Hightower.**

36.     On February 22, 2024, while Hightower's investigation into his behavior was ongoing, Knudsen requested and received a spreadsheet containing the names, telephone numbers, and emails for all clients in his book of business. Knudsen did not return this spreadsheet following this termination. This information belongs to Hightower, and is subject to the SPA's restrictions. Moreover, it allows Knudsen to target Hightower clients and prospective clients.

37.     Hightower has learned that Knudsen is actively seeking competitive employment with Hohimer in violation of the SPA, and is imminently seeking to move to a competing firm and solicit clients he formerly serviced on behalf of Hightower.  If he were allowed to improperly compete and improperly divert Hightower business, Hightower would suffer immediate harm. These relationships also represent incalculable future harm to Hightower in the form of lost goodwill and lost sources of potential referrals.  Knudsen's ongoing actions and disregard for his obligations to Hightower threaten the assets he managed for Hightower, in addition to the

---

[33] *See* Correspondence from Scot Kees to Lars Knudsen dated February 28, 2024, attached hereto as Exhibit 2.

confidentiality of Hightower's proprietary, trade secret, and sensitive client information.

38.     Multiple clients have since reached out to Hightower to report that they have been contacted by Knudsen, and that Knudsen is disparaging Hightower, including telling clients that their money is "not safe" with Hightower. He has told these clients to "delink their accounts" and reportedly Knudsen has sought to obtain a copy of his son Eric's contract to potentially form a new entity to be competitive with Hightower in breach of his Agreements.

39.     It is clear from Hightower's discussions with its clients that Knudsen is in violation of the SPA, wherein he agreed not to "contact, request, solicit or encourage" any Hightower clients to move their business or "otherwise interfere with, reduce, or harm the Company's relationships" with such persons. Hightower personnel have consistently been informed by clients that Knudsen has contacted them by telephone and/or e-mail to disparage Hightower.

40.     On or around March 15, 2024, Client "A" informed Hightower that he received a telephone call from Knudsen to advise him of his departure from Hightower.  Client "A" informed Hightower that Knudsen stated that he would be setting up shop elsewhere.  Following the conversation with Knudsen, Client "A" was left with questions regarding the stability and continuity of the Hightower Bellevue office.

41.     At around the same time, Client "B" informed Hightower that Knudsen had contacted her by telephone to advise of his departure and inform her he was setting up shop elsewhere. Client "C" similarly advised Hightower that Knudsen had contacted her by telephone to let her know that he had departed Hightower and inform her he was setting up shop elsewhere.

42.     At around the same time, Knudsen reached out to Client "D" (a married couple) to disparage Hightower and provide them with false and/or misleading information about the circumstances surrounding his termination from Hightower, prompting Client "D" to terminate

their relationship with Hightower and move their substantial accounts. Client "D" additionally advised that they thought Hightower was "despicable" for the way it treated Knudsen.

43.     Knudsen has also called Client "E" and members of her family, all of whom have Hightower accounts.  Client "E" informed Hightower that her parents were "very unsettled" after receiving a call from Knudsen and hearing him discuss Hightower.  Client "E" further informed Hightower that after hearing from Knudsen, she had her own questions about Hightower Bellevue's leadership going forward—evidently Knudsen had been questioning the remaining Partners' ability to run the business.

44.     As is evident from the steady stream of clients reaching out to Hightower, Knudsen has been contacting Hightower's clients to disparage and defame Hightower, and further to encourage them to work with him instead of Hightower. It is critical that this Court grant injunctive relief stopping Knudsen from retaining and misusing Hightower information, from improperly competing against Hightower, and from improperly diverting this business from Hightower.  If these remaining clients are diverted away, Hightower will lose these relationships for years into the future.  The damages that flow from such an occurrence are huge and extremely difficult to quantify.  So too is the negative impact and loss of goodwill, referral sources, confidentiality of client information, Hightower's contractual rights associated with its acquisition of Knudsen's business, and office stability should Knudsen remain unchecked.

## COUNT I – BREACH OF CONTRACT

45.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

46.     Hightower has performed all of its material obligations under the Transaction Documents, all of which are valid and enforceable.  Specifically, Hightower has performed all of its material obligations under the SPA, a valid and enforceable agreement.

18

47.     Knudsen breached the SPA by, *inter alia*, competing against Hightower, soliciting clients in contravention of the express terms of the SPA, improperly using Hightower-owned confidential and proprietary information to breach these terms, and by disparaging Hightower to third parties.

48.     Knudsen's breaches of the SPA have damaged Hightower in the form of lost revenue and business, loss of customer goodwill, and loss of confidentiality of client records and proprietary strategies, among other things.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS (IN VIOLATION OF THE DEFEND TRADE SECRETS ACT – 18 U.S.C. § 1836)

49.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

50.     Knudsen had full access to Hightower's client lists, client contact and financial information, proprietary investment strategies, and other confidential and/or proprietary information, all of which constitute trade secrets under the DTSA, 18 U.S.C. § 1836.  Because Hightower services client accounts in several states, and invests its clients' money in products in interstate commerce, these trade secrets are related to products and services used in and intended for use in interstate commerce.

51.     Under the DTSA, trade secrets include all forms and types of financial information, business, technical, and economic information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorized physically, electronically, graphically, photographically, or in writing.  18 U.S.C. § 1839(3). Hightower's client lists, client contact and financial information, proprietary investment strategies, and other confidential and/or proprietary information fall squarely within the DTSA's definition

of a trade secret.

52.     Hightower's trade secrets and confidential and/or proprietary information derive independent economic value, actual and potential, from not being generally known to and/or readily ascertainable through proper means by other persons who could obtain economic value from the disclosure or use of such information.  Hightower expends significant resources to obtain and protect these trade secrets, and Hightower is entitled to rely upon its ability to protect those trade secrets from disclosure to or use by a competitor.  Furthermore, Hightower is the entity in which rightful legal or equitable title to, or license in, the trade secrets are reposed.

53.     In fact, Hightower took active steps, which were reasonable under the circumstances, to maintain the secrecy of this confidential, proprietary, and/or trade secret information.  Generally, to protect itself from unfair competition, Hightower makes substantial efforts to ensure the confidentiality of information concerning its clients and strategies.  In addition to the contractual safeguards set forth in the Agreement, Hightower implements policies and the other security measures described above.

54.     Knudsen requested and received a detailed Hightower client list shortly before his termination, and is currently using that client list to contact Hightower clients in furtherance of his efforts to compete against Hightower.  Knudsen has threatened to, and is in the process of, willfully and maliciously misappropriating, disclosing, and using these trade secrets and confidential and/or proprietary information to assist him in engaging in his new business, which is in direct competition with Hightower.  Further, Knudsen is using such trade secrets and confidential and/or proprietary information without authorization, and without a right or privilege to do so, and by improper means, including breaches of his contractual duties and duties of loyalty and confidentiality. Knudsen knows or should have known the information is confidential and

20

protected as a trade secret, and is being acquired by improper means; but, instead, he is receiving and using the information intentionally or with reckless disregard.

55.     Knudsen is disclosing and/or using Hightower's trade secrets without either express or implied consent.  He is using improper means to acquire Hightower's trade secrets, including breach and inducement of breach of duties to maintain secrecy of the trade secrets.  Furthermore, at the time of disclosure and/or use of Hightower's trade secrets, Knudsen knows or had reason to know that the trade secrets were being (i) derived from or through persons who had used improper means to acquire the trade secrets; (ii) acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the trade secrets; and (iii) derived from or through persons who owed duties to Hightower to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

56.     Thus, Knudsen has threatened the misappropriation of Hightower trade secrets and confidential and/or proprietary information, and is in the process of actually misappropriating such information, and has converted and wrongfully appropriated for his own use such information, in violation of the Defend Trade Secrets Act.  *See* 18 U.S.C. § 1836.

57.     Knudsen's threats to misappropriate and use, and his actual misappropriation and use of, Hightower's trade secrets and confidential and/or proprietary information as described herein is intentional, willful and/or is being carried out with malice and an intent to injure Hightower and its businesses, and has directly and proximately caused, and will continue to cause, Hightower to suffer damages and other irreparable harm.

## COUNT III – UNFAIR COMPETITION

58.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

59.     Knudsen has and continues to engage in unfair competition with Hightower,

through misappropriation of trade secrets, misappropriation of confidential customer information, misappropriation of confidential investment strategies, and breach of common law and contractual duties. In doing so, Knudsen has jeopardized Hightower's business by unfair methods.

60. As a result of these unfair methods, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND PROSPECTIVE ECONOMIC ADVANTAGE

61. Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

62. Hightower maintains business relationships with its clients, prospective clients, sources of referral business, and other third parties. Hightower has a reasonable expectation of continuing these valid business relationships with third parties and entering into new valid business relationships. Knudsen has knowledge of these relationships; in fact, he was tasked with developing and maintaining many of these relationships. When he breached his contractual and common law duties to Hightower, Knudsen was acting intentionally and without justification to interfere with Hightower's expectations and relationships. Knudsen's interference prevented Hightower's legitimate business expectancies from continuing and/or ripening into valid business relationships.

63. As a result of Knudsen's actions, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT V – CONVERSION

64. Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

65. Knudsen has removed and is using Hightower's trade secrets and confidential

information.  Hightower has ownership rights and the right to possess these trade secrets and confidential information.  Knudsen converted the same by wrongful acts, including breaches of common law, contractual, regulatory, and statutory obligations.

66.     As a result of the conversion of this confidential, proprietary, and trade secret information, Hightower has suffered, continues to suffer, and will suffer damages and irreparable harm.

## COUNT VI – UNJUST ENRICHMENT

67.     Hightower repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

68.     Hightower conferred benefits on Knudsen in the form of client relationships, confidential information, and financial support.  Knudsen was aware of these benefits, and retained benefits from confidential information and client relationships under circumstances where it would be unjust to retain the same without payment.  To wit, Knudsen continues to use Hightower's information and leverage Hightower relationships following his discontinuation of his affiliation with Hightower to remove Hightower's business.

## ATTORNEYS' FEES

69.     Hightower is entitled to recover attorneys' fees and costs pursuant to the Agreement.  Paragraph 12(b) of the SPA provides that Knudsen "will pay for any… expense… in connection with or arising out of any violation, contravention or breach of this Agreement by [Knudsen]."[34]

## APPLICATION FOR INJUNCTIVE RELIEF

70.     Hightower repeats and re-alleges the allegations contained in the preceding

---

[34] Ex. 1A, p. 11 ¶ 12(b).

paragraphs as if fully set forth herein.

71.     Hightower hereby moves for temporary and preliminary injunctive relief to maintain the status quo pending arbitration and to prevent irreparable harm which is being caused by Knudsen's conduct.  Hightower provided Knudsen with significant compensation for its acquisition of business, and is entitled to the benefit of the bargain from the SPA's restrictive covenants designed to protect that acquisition.

72.     Knudsen's wrongful conduct in impermissibly using Hightower's confidential client information and confidential investment strategies, joining a competing business, contacting and soliciting clients, and moving business away from Hightower has caused and will continue to cause great and irreparable injury to Hightower unless and until Knudsen's conduct is enjoined.

73.     If Knudsen's improper conduct continues, Hightower will continue to lose clients, business relationships, its bargained-for contractual rights associated with Knudsen's sale of business, and the competitive advantage of its proprietary investment strategies that required substantial efforts to develop and protect.  Moreover, the confidentiality of Hightower's customer information and trade secrets are being destroyed.  The DTSA provides for injunctive relief to protect Hightower from actual or threatened misappropriation of trade secrets in exactly such a scenario.

74.     Knudsen's ongoing actions threaten the assets under management he serviced while affiliated with Hightower, in addition to untold numbers of prospective clients, referral sources, and other business relationships.  Moreover, his actions also threaten to damage office continuity, confidentiality of client information (which could have regulatory implications), and goodwill, among other things.

75.     Hightower has no adequate remedy at law for the injuries it is currently suffering as a result of Knudsen's wrongful conduct because the full extent and scope of Hightower's losses are unquantifiable or unascertainable.  Indeed, through the SPA, Knudsen agreed that Hightower would suffer irreparable harm and be entitled to an injunction should he threaten to breach or breach any of the restrictive covenants contained in the SPA.

76.     Hightower is likely to succeed on the merits of its claims because it has evidence that Knudsen has impermissibly used Hightower's confidential and trade secret information, has improperly joined a competing business, and has contacted, solicited, and moved accounts for Hightower clients.  Evidence of wrongdoing will grow once Hightower receives discovery from Knudsen, which it is asking for on an expedited basis by way of a Motion for Expedited Discovery, that will be filed shortly following this Complaint.  Upon receipt of Knudsen's responses to these discovery requests, Hightower will move for a preliminary injunction seeking the following: (1) an order prohibiting Knudsen from retaining, using, or disclosing Hightower's confidential information; (2) an order prohibiting Knudsen from soliciting or otherwise improperly contacting Hightower's clients; (3) an order prohibiting Knudsen from competing against Hightower in violation of the SPA; and (4) an order requiring that Knudsen return all of Hightower's confidential information, as defined and required in the SPA.

77.     The balance of hardships strongly favors granting a preliminary injunction here, as Hightower will continue to suffer irreparable harm if such relief is not granted and Knudsen will suffer no hardship if such relief is granted.  Indeed, Knudsen has received substantial consideration in exchange for his promises to abide by restrictive covenants which he is now violating.

78. Enjoining Knudsen's conduct will simply put him in the position he agreed to be in, when he sold a portion of his business to Hightower. On the other hand, Hightower will continue to suffer irreparable harm if Knudsen's unlawful conduct is not enjoined.

## V. PRAYER FOR RELIEF

WHEREFORE, Hightower respectfully prays that this Court:

A. Enter a preliminary injunction to preserve the status quo until the ultimate claim for damages is heard in AAA, providing that:

    1.) Until February 26, 2026, Knudsen shall not, directly or indirectly, on his own behalf or on behalf of any other person:

        a. contact, request, solicit, encourage or provide services to, or assist any person in contacting, requesting, soliciting, encouraging or providing services to any person who is (or was during the twelve (12) month period preceding Knudsen's termination from Hightower) a broker, financial advisor, employee, independent contractor, platform affiliated person, recruit, customer, or prospective customer or vendor of Hightower or HT Bellevue Advisors, or any other person with whom Hightower or HT Bellevue Advisors has (or had during the twelve (12) months preceding Knudsen's termination from Hightower) (the "Protected Business Contacts"), with the intent or effect of (i) providing any such Protected Business Contact with any products, services and/or advice that are the same as or similar to any of the products, services and/or advice provided by Hightower or HT Bellevue Advisors, (ii) entering into any agreement, engagement or opportunity to provide any such products, services and/or advice to any Protected Business Contact, (iii) accepting or receiving any transfer or assets, accounts or confidential or personal information related to any Protected Business Contact and/or (iv) inducing any Protected Business Contact to cease doing business with or reduce the level of business it does with Hightower or the Partner Firm;

        b. request, solicit or encourage, or assist any person in requesting, soliciting or encouraging, or accept or assist any person in accepting if offered with or without solicitation, the employment or services of any person who is (or was during the twelve (12) month period preceding Knudsen's termination from Hightower) an employee, independent contractor, financial advisor or broker of Hightower or HT Bellevue Advisors (or who is or was during the twelve (12) month period preceding Knudsen's termination from Hightower) (the "Protected Personnel");

c. request, solicit or encourage, or assist any person in requesting, soliciting or encouraging, any Protected Personnel to terminate such person's employment or engagement with Hightower or HT Bellevue Advisors;

d. hire or engage, agree to hire or engage or assist any other person in hiring or engaging the services of any Protected Personnel; or

e. otherwise interfere with, reduce, or harm Hightower's relationships with its clients, prospective clients, or business contacts;

f. accept or receive any transfer of assets, accounts or confidential or personal information related to any Hightower customer or prospective customer; or

g. own any interest in, manage, control, participate in, consult with or become engaged or involved in any person engaged in or to engage in the Business (defined as (i) the business of acquiring and/or recruiting investment advisor firms and/or investment advisors or broker personnel; (ii) the business of providing services or products relating to investment management or advice and product or services ancillary thereto; or (iii) any other business that Hightower conducts or operates or takes material steps towards conducting or operating during the course of the Partner Arrangements) within the United States or any other jurisdiction in which Hightower or HT Bellevue Advisors does business, including by being or becoming an organizer, owner, co-owner, trustee, promoter, affiliate, investor, lender, partner, joint venturer, stockholder, officer, director, employee, consultant, licensor or advisor of, to or with any person engaged in or to engage in the Business;

2.) Knudsen shall not disclose or otherwise use Hightower's confidential information in any manner or medium whatsoever; and

3.) Knudsen shall return all Hightower confidential information.

B. Award Hightower its costs, including reasonable and necessary attorneys' fees; and

C. Award Hightower such other and further relief, at law or in equity, to which it may be justly entitled.


Dated this 21st day of March, 2024.

Respectfully submitted,

**HENNEMAN RAU KIRKLIN & SMITH LLP**

By:   /s/ *Matthew B. Henneman*
      Matthew B. Henneman
      Texas State Bar No. 00790865
      Federal ID No. 21661
      815 Walker Street, Suite 1440
      Houston, Texas 77002
      Phone: 713-955-6030
      Fax: 713-955-6141
      Email: mhenneman@hrkslaw.com

      **ATTORNEYS FOR PLAINTIFF,**
      **HIGHTOWER HOLDING, LLC**