IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HIGHTOWER HOLDING, LLC, | § § § | |
| *Plaintiff*, | § § | |
| vs. | § § | Case No. 1:24-CV-02328 |
| LARS KNUDSEN, | § § § | |
| *Defendant*. | § | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff Hightower Holding, LLC ("Hightower" or "Plaintiff"), pursuant to Fed. R. Civ. P. 65, files this Memorandum of Law in Support of Its Motion for a Temporary Restraining Order against Defendant Lars Knudsen ("Knudsen"), and would show the following in support thereof:

**I.    INTRODUCTION AND RELIEF REQUESTED**

1.    As fully set forth in its Amended Complaint and Application for Injunctive Relief in Aid of Arbitration (the "Complaint"),[1] Hightower seeks immediate injunction relief to stop Knudsen from breaching the terms of his Standard Protective Agreement (Sale-Based) (the "SPA") (ECF No. 2-1, Ex. 1-A), misappropriating Hightower's confidential information and trade secrets, and tortiously interfering with Hightower's contractual and prospective economic advantage. Knudsen sold an interest in his wealth management and investment advisory business to Hightower in exchange for significant consideration (the "Acquisition"). As a material inducement for Hightower to enter into the Acquisition, and to protect Hightower's competitive interests and its confidential and trade secret information, Knudsen executed the SPA and agreed to certain post-

---

[1] ECF No. 2. Hightower incorporates herein its statement of facts from its Complaint as well as the content of the Declaration of Randall Williams-Gurian (ECF No. 2-1) and the Supplemental Declaration of Randall Williams-Gurian (attached hereto as Exhibit 1).

sale restrictions on competition against Hightower, solicitation of Hightower clients, interference with Hightower's business relationships, and use of Hightower's confidential and trade secret information. Knudsen is in violation of these obligations, and is causing Hightower ongoing and irreparable harm. Hightower is entitled to immediate and emergency injunctive relief to stop Knudsen's unlawful conduct.

## II. APPLICABLE LAW

2. The SPA states: "This [SPA] and the interpretation hereof, and all issues, matters, suits, disputes, controversies and determinations regarding enforceability, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without reference to any conflict of law principles that would result in the application of the law of any other jurisdiction." (ECF No. 2-1, Ex. 1-A, ¶ 12(e)).

3. Because the contracts at issue in this dispute, including the SPA, stem from (and were material to) the partial acquisition of one Delaware limited liability company (Hightower Bellevue Advisors, LLC) by another Delaware limited liability company (Hightower Holding, LLC), the application of Delaware law to this suit is appropriate. *See, e.g., LKQ Corp. v. Rutledge*, No. 21 C 3022, 2022 WL 1720590, at *3 (N.D. Ill. May 27, 2022), aff'd, No. 23-2330, 2024 WL 1130244 (7th Cir. Mar. 15, 2024) (honoring Delaware choice of law provision, because the defendant had "not shown a legitimate difference between the two states' laws, or that applying Delaware law would be contrary to a fundamental policy of Illinois").

## III. LEGAL STANDARD

4. The standard for obtaining a temporary restraining order under Delaware law is similar to the standard under Illinois law. To prevail on a motion for a temporary restraining order under Delaware law, the moving party must demonstrate "that '(i) it has a colorable claim for relief on the merits; (ii) it will suffer irreparable harm if relief is not granted; and (iii) the balance of

hardships favors the moving party.'" *In re COVID-Related Restrictions on Religious Services*, 285 A.3d 1205, 1227 (Del. Ch. 2022) (citing *Stirling Inv. Hldgs., Inc. v. Glenoit Universal, Ltd.*, 1997 WL 74659, at *2 (Del. Ch. Feb. 12, 1997)). Of these elements, the "presence of imminent, irreparable harm is the *sine qua non* for the issuance of a TRO." *Id*. It predominates because "the purpose of a TRO is to preserve the status quo so that the court can conduct a fuller inquiry at a later stage of the case. . . ." *Id*.

5.  A plaintiff need not establish that it *will* win the final disposition of its claims; instead, a plaintiff need only show that there is a reasonable probability that it would prevail at a final hearing on the merits of one or more of its claims. *See ZRii, LLC v. Wellness Acquisition Grp., Inc.,* No. CIV. A. 4374-VCP, 2009 WL 2998169, at *8 (Del. Ch. Sept. 21, 2009).

IV.  ARGUMENT

A.  Hightower has a colorable claim against Knudsen on the merits

6.  The first factor a plaintiff must establish when seeking a temporary restraining order is that it has a colorable claim. The plaintiff "must meet the low burden of showing 'that a colorable claim has been made out if the facts alleged are true.'" *Arkema Inc. v. Dow Chem. Co.*, No. CIV.A. 5479-VCP, 2010 WL 2334386, at *4 (Del. Ch. May 25, 2010) (citing *Topspin P'rs, L.P. v. RockSolid Sys., Inc.,* 2009 WL 154387, at *2 (Del.Ch. Jan.21, 2009). It is considered the "most lenient standard[.]" *AB Value Partners, LP v. Kreisler Mfg. Corp.*, No. CV 10434-VCP, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014).

7.  Hightower has unquestionably met this standard because Knudsen has started and is actively competing with Hightower by soliciting its customers, by falsely disparaging Hightower to its customers in the process, thereby violating binding contracts Knudsen executed, not to mention Knudsen's common law and statutory obligations to Hightower. Indeed, he is pursuing employment with a business competitive to Hightower, in direct violation of his SPA. Hightower

also has evidence that several of its clients terminated their relationships with Hightower as a result of being wrongfully contacted by Knudsen.

8. The elements of a breach of contract claim under Delaware law are: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) resulting damage to the plaintiff. *See VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del. 2003). To be enforceable, a restrictive covenant must: (1) meet general contract law requirements, (2) be reasonable in scope and duration, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. *See Kan-Di-Ki, LLC v. Suer,* 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015). In addition, restrictive covenants in the context of the sale of a business are subject to a "less searching [inquiry] than if the Covenant had been contained in an employment contract." *Id.*

### i. The SPA's restrictions are enforceable, and bind Knudsen

9. Knudsen has already agreed that the restrictions contained in the SPA are "necessary and reasonable in order to protect Hightower's proprietary interests, goodwill, workforce, relationships, and Confidential Information, and relate to matters that are of a special, unique and extraordinary value". (ECF No. 2-1, Ex. 1-A, ¶ 1(f)). Knudsen further agreed that he had "consulted with legal counsel regarding the covenants and restrictions contained [in the SPA] and, based on such consultation, has determined and hereby acknowledges and agrees that the covenants and restrictions contained [in the SPA] are reasonable in terms of duration, scope and area restrictions and are necessary to protect the substantial goodwill of Hightower." (ECF No. 2-1, Ex. 1-A, ¶ 1(l)).

10. As noted in a recent case upholding a restrictive covenant ancillary to a sale of a business: "Delaware courts are strongly in favor of enforcement of contracts freely entered into by parties, and the Court will only set aside the agreement 'upon a strong showing that dishonoring

4

the contract is required to vindicate a public policy interest even stronger than the freedom of contract.'" *O'Leary v. Telecom Res. Servs. LLC*, C.A. No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Jan. 14, 2011) (citing *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005)).

11. The SPA is a valid and enforceable agreement, and is supported by significant consideration – Knudsen received approximately $900,000 in cash and more than 200,000 Hightower equity units, not to mention the specialized training, licensing, and access to Hightower client accounts (and their associated confidential information) in connection with Hightower's acquisition of his business. *See, e.g., O'Leary,* No. 10C-03-108, 2011 WL 379300, at *5 (sufficient consideration where sellers received a $1 million purchase price for business, executive positions, and six-figure salaries in exchange for a 4-year non-compete).

12. The SPA's restrictions are reasonable in duration. The SPA provides that Knudsen is barred from contacting or soliciting Hightower clients, interfering with Hightower relationships, and competing against Hightower either for 48 months following the date of the last payment he received under the transaction agreements (until August 6, 2025) or for 24 months following the date of the termination of Knudsen's partnership arrangement under the transaction agreements (until February 26, 2026). (ECF No. 2-1, Ex. 1-A, ¶ 4, ECF No. 2, ¶ 23). Restrictions of longer duration are regularly found reasonable under Delaware law in the sale-of-business context. *See, e.g., Hough Assocs., Inc.,* C.A. No. 2385-N, 2007 WL 148751, at 14 (Del. Ch. Jan. 17, 2007) (upholding a restrictive covenant of five years following the date of the stock purchase agreement or three years after termination of employment with the Company); *Turek v. Tull,* 139 A.2d 368, 372-75, *aff'd,* 147 A.2d 658 (1958) (restrictive covenant of ten years in the context of a sale was reasonable).

5

13. The SPA's restrictions are also reasonable in scope. The SPA provides for restrictions on competition within the United States or any other jurisdiction in which Hightower conducts business. Hightower's business is nationwide—it operates offices throughout the country and services a broad and geographically diverse client base. Delaware courts have found similar restrictions to be enforceable in the sale-of-business context. *See Kan-Di-Ki, LLC,* 2015 WL 4503210, at *19 ("non-competition agreements [barring competition in twenty-three states] and broader, have been found reasonable by Delaware courts in cases where the restrictive covenant is executed as part of the sale of a business"). More specifically, the Court of Chancery of Delaware has opined:

> To be sure, this Court has enforced non-competes with a nationwide scope, but only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry [...] for a stated period of time after the sale. These broader restrictions make sense following the sale of a business. The buyer has just paid handsomely for the business and the broad non-compete clears the seller from the competitive space while the buyer strives to make the business her just bought successful.

*FP UC Holdings, LLC v. Hamilton*, No. CV 2019-1029-JRS, 2020 WL 1492783, at *7 (Del. Ch. Mar. 27, 2020); *see also Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *11-12 (Del. Ch. Nov. 18, 1992) (non-compete provision with no geographic limitation reasonable where necessary to protect employer's goodwill); *Concord Steel Inc. v. Wilmington Steel Processing Co.,* C.A. No. 3369-VCP, 2008 WL 902406, at *5 (Del. Ch. Apr. 3, 2008) (upholding as reasonable covenant that prevented defendant from competing with plaintiff in "any Competitive Business...on a worldwide basis"); *O'Leary,* 2011 WL 379300, at *5 (enforcing the national scope of a non-competition agreement made in connection with the sale of a business where plaintiff's business operated throughout the United States).

14. The restrictive covenants are also specifically tailored to protect Plaintiff's legitimate interests in its confidential information and goodwill. Knudsen acknowledged as much in the SPA. (ECF No. 2-1, Ex. 1-A, ¶¶ 1(f), (l)). "By bargaining for the inclusion of [a noncompete in a sale-of-business, the purchaser] was protecting its legitimate economic interest in maintaining business relationships it or its predecessor had [... and] acted reasonably and legitimately in insisting on some measure of protection from the possibility that [the former employee] would go out and take those clients or otherwise undermine [the business]." *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *20; *see also Hough Assocs.*, 2007 WL 148751, at *14 ("By securing restrictions binding [the business interest seller, the purchaser] protected its legitimate economic interests" and "safeguarded its investment" by ensuring the seller "could not sell himself directly to a competitor," giving the purchaser "important leverage in protecting its business").

15. The final consideration to determine the enforceability of the SPA's restrictive covenants is a balancing of the equities. Here, the balance favors enforcement of the SPA. Because a balancing of the equities is also a prerequisite to injunctive relief, this analysis is addressed in more depth below. However, in the sale-of-business context, non-competes are enforced by Delaware courts "almost as a matter of course" and "the rule of law is clear that, on application of the injured purchaser of the business, equity will enjoin the continued breach of the restrictive covenant." *Tull*, 147 A.2d at 663.

### ii. Knudsen has breached, and continues to breach, the SPA

16. Through the SPA, Knudsen agreed the he would not, among other things: participate in, consult with, or become engaged in the business of providing services or products related to investment management or advice or ancillary services, or any other business that Hightower conducts, including by becoming an owner, affiliate, partner, officer, director, employee, consultant, or advisor of any entity providing such products or services. (ECF No. 2-

7

1, Ex. 1-A, ¶ 5). Despite the foregoing, Knudsen has engaged in advanced discussions regarding taking a position with Hohimer Wealth Management, LLC ("Hohimer"), a competitive business. Such an affiliation would plainly violate the SPA, as Hohimer provides investment management and ancillary services.[2]

17. Through the SPA, Knudsen also agreed that he would not: (i) contact, request, solicit, encourage or provide services to, or assist any person or business in contacting, requesting, soliciting, encouraging or providing services to any person or business who is (or was during the previous 12 months) a Hightower customer; (ii) induce any Hightower customers to cease doing business with Hightower or reduce their level of business with Hightower; or (iii) otherwise interfere with, reduce, or harm, or attempt to interfere with, reduce, or harm, any of Hightower's relationships with its customers. (ECF No. 2-1, Ex. 1-A, ¶ 4). Knudsen has repeatedly violated these provisions, including by:

    a. Telling clients their money is not safe with Hightower;

    b. Instructing clients to delink their accounts from Hightower;

    c. Contacting Client "A" and telling her that he had left Hightower and was setting up shop elsewhere, and leaving her with concerns about the stability of Hightower Bellevue;

    d. Contacting Client "B" and Client "C" to tell them that he had left Hightower and was setting up shop elsewhere;

    e. Contacting Client "D" and providing them with false information about Hightower, leading Client "D" to terminate their relationship and move significant accounts, calling Hightower "despicable" in the process;

    f. Contacting Client "E" and family members and leaving them "very unsettled" after a discussion of Hightower; and

---

[2] *See* Hohimer Form ADV Part 2A Brochure dated March 10, 2024, attached as Exhibit 2 at p. 4 (Hohimer "offers a variety of advisory services, which include investment and wealth management, financial planning, and consulting services."). The Form ADV Part 2A is an SEC-required filing intended to provide the public about registered investment adviser firms' business practices. Hohimer is a registered investment adviser firm.

      g. Making travel plans to a Hightower-sponsored event in Hawaii to "conduct business" at the same hotel in which Hightower Bellevue's largest client—and several other clients—will be staying.

(ECF No. 2-1, ¶¶ 32-37; Ex. 1, ¶¶ 5-9).

    18.    Additionally, Knudsen has misappropriated Hightower's confidential and trade secret client information. Specifically, while he was under the investigation that ultimately led to his termination, Knudsen requested and received a spreadsheet containing the names, telephone numbers, and emails for all of the clients he serviced on behalf of Hightower. Such a list is also plainly protected as under the SPA, which includes "customer lists" in the contractual definition of "Confidential Information." (ECF No. 2-1, Ex. 1-A, ¶ 3(a)). Knudsen agreed that this list is "vital, sensitive, confidential and proprietary" to Hightower, and that it is "critical to Hightower's protection of its goodwill and competitive advantages in the industry". (ECF No. 2-1, Ex. 1-A, ¶ 3(d)). He further agreed that he would not disclose or otherwise use this customer list except to perform his duties on behalf of Hightower. (ECF No. 2-1, Ex. 1-A, ¶ 3(c)). Knudsen also agreed that this customer list was the exclusive property of Hightower, and that he would immediately return the customer list to Hightower after his termination. (ECF No. 2-1, Ex. 1-A, ¶¶ 6(a), (b)). He did not return this list following his resignation, and the client list has been allowing Knudsen to target Hightower's client base as described above. These actions violate the SPA's provisions regarding confidential information.

    **iii.**    **Hightower is also entitled to injunctive relief pursuant to the Defend Trade Secrets Act**

    19.    The customer list described above also is a trade secret under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*. The DTSA defines trade secrets to mean (among other things) "all forms and types of financial [or] business […] information, including […] compilations" if the owner has taken reasonable measures to keep such information secret, and the

information derives independent economic value, actual or potential, from not being readily known to, and not being readily ascertainable through proper means by others who can obtain economic value from the disclosure of use of the information. 18 U.S.C. § 1839(3).

20. The customer list at issue here is a trade secret. *See, e.g., Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9, n. 2 (N.D. Ill. Sept. 8, 2017) (the DTSA definition for trade secret "includes any valuable business information for which reasonable measures are taken to maintain secrecy, and is therefore applicable to customer lists"). Hightower takes reasonable measures to protect its trade secrets, including contractual restrictions, confidentiality policies and procedures, locking its offices and having a security firm monitor the premises, password-protecting its computer systems (which are on a secure network), and limited access to information to authorized personnel. (ECF No. 2-1, ¶¶ 7-9).

21. Knudsen acknowledged in the SPA that Hightower is the owner of the customer list. (ECF No. 2-1, Ex. 1-A, ¶¶ 6(a)); *see also* PSAA, ECF No. 2-1, Ex. 1-C, ¶2(c) ("All data, books, records and other information" relating to clients "shall at all times remain the property" of Hightower). To protect trade secrets from improper disclosure or use, the DTSA allows for injunctive relief "to prevent any actual or threatened misappropriation". 18 U.S.C. § 1836(b)(3)(A).

22. Under the DTSA, misappropriation includes (A) acquisition of a trade secret by a person who knows or has reason to know the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret, (II) acquired under

circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. 18 U.S.C. § 1839(5).

23. Knudsen is using (or at a minimum threatening to use) the customer list he acquired from Hightower to harm Hightower's business. He does not have Hightower's consent to use this customer list. Moreover, Knudsen knows or should know that his acquisition of the customer list occurred under circumstances giving rise to a duty to maintain its secrecy or limit its use, and that he owed Hightower a duty to maintain the list's secrecy or limit its use. (ECF No. 2-1, Ex. 1-A, ¶¶ 3, 6). Thus, Hightower is entitled to injunctive relief to restrain the actual and/or threatened misappropriation of its customer list and other trade secret information.

24. Hightower has a colorable claim against Knudsen, the first element to establish that it is entitled to a temporary restraining order.

**B. Hightower has established irreparable harm**

25. Without a temporary restraining order, Hightower will suffer irreparable harm by Knudsen's unfair competition in breach of the SPA, and his exploitation of Hightower's trade secret and confidential information. This irreparable harm includes loss of revenue and business, loss of customer goodwill, and loss of confidentiality and client records and proprietary strategies, and the loss of the benefit of its bargain with Knudsen.

26. Knudsen agreed that a breach "of any of the covenants or restrictions contained [in the SPA] would result in irreparable harm and damages that cannot be adequately compensated by a monetary award and, accordingly, Hightower will be entitled to injunctive or other equitable relief to prevent or redress any such breach (without posting a bond or other security)". (ECF No. 2-1, Ex. 1-A, ¶ 1(g)). He further agreed that any breach or threatened breach of any of the SPA's

11

covenants described herein "will result in irreparable harm and continuing damages to Hightower and its business and that Hightower's remedy at law for any such breach or anticipated or threatened breach will be inadequate, and Hightower will suffer damages that may be difficult to quantify". (ECF No. 2-1, 1-A, ¶ 12(b)). Accordingly, Knudsen agreed that Hightower would be entitled to injunctive relief, "including any injunction […] enjoining or restricting the breach or threatened breach of any" covenant in the SPA. (*Id.*).

27. Delaware courts routinely hold that such acknowledgements, without more, are sufficient to support a finding of irreparable harm. *See Revolution Retail Sys, LLC v. Sentinel Tech, Inc.,* No. 10605, 2015 WL 6611601, at *22 (Oct. 30, 2015) ("[t]he parties' arm's length agreement concerning the inadequacy of a legal remedy satisfies the irreparable harm requirement for injunctive relief); *Newell Rubbermaid Inc. v. Storm,* No. 9398, 2014 WL 1266827, at *11 (Del. Ch. Mar. 27, 2014) ("stipulations as to irreparable harm have been held to be sufficient to establish that element in order to issue preliminary injunctive relief.").

28. Furthermore, Delaware's respect for private contracts mandates that courts enforce non-competition clauses according to their plain terms, which, in this case, would establish irreparable harm. *Hough Assocs.,* 2007 WL 148751, at * 18 ("[n]o one has to sign a contract [that provides that a breach would, by definition, establish irreparable harm], but when one does, he should not complain if the terms are given effect."). Therefore, Knudsen's breach has caused irreparable harm to Plaintiff and injunctive relief is appropriate.

29. Irreparable harm is also present under the unique circumstances here, in the form of loss of goodwill and competitive advantage. *See Technicon Data Sys. Corp v. Curtis 1000, Inc.,* No. 7644, 1984 WL 8268, at *10 (Del. Ch. Aug. 21, 1984) ("plaintiff has made a sufficient showing of irreparable harm in the form of loss of good will and unfair competitive

advantage."); *In re Shawe & Elting LLC,* 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015), *aff'd,* 157 A.3d 152 (Del. 2017) (irreparable harm "has been found to include harm to a corporation's reputation, goodwill, customer relationships, and employee morale").

30. Further, "Delaware courts have 'consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached,' and 'use injunctive relief as the principal tool of enforcing covenants not to compete.'" *See Concord Steel, Inc. v. Wilmington Steel Processing Co.,* No. CIVA. 3369-VCP, 2008 WL 902406, at *10 (Del. Ch. Apr. 3, 2008) (citing *Hough Assocs.,* 2007 WL 148751). Unless parties recognize the threat of injunctive relief in the event of a breach of a noncompete, those agreements "will not produce their intended effect, breaches will proliferate, and complicated damage inquiries into the 'what might have been' world will ensue." *Id*.

31. In the sale of business context, there is "uncertainty about what would have happened had the [noncompete] been honored." *Hough Associates, Inc.*, 2007 WL 148751, at *18. And, "[t]hat is precisely why [Delaware] law has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached." *Id*. Injunctive relief is the principal device to enforce non-competes because "[m]easuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy." *Id*.

32. Delaware courts have further found irreparable harm where, as here, "an after-the-fact attempt to quantify damages would 'involve [a] costly exercise[ ] in imprecision' and would not provide full, fair, and complete relief for the alleged wrong." *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC,* No. 7161-VCP, 2012 WL 120201, at *6 (Del. Ch. Jan. 13, 2012). It has already been established that Knudsen's breaches of the SPA have caused some clients to terminate their Hightower relationship. It is "unknown and possibly unknowable" how

13

much new business or investment from these (and other) clients, or how many new clients, Hightower might have obtained absent Knudsen's illegal competition. *Singh v. Batta Envtl. Assocs., Inc.*, C.A. No. 19627, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003). This makes it "impossible to calculate with any certainty the full extent of the damage that will be inflicted" if Knudsen is allowed to continue competing in violation of the Agreements. *Id*. Thus, the situation presented reveals both an inadequacy of damages as a remedy and significant difficulty calculating damages, which constitutes irreparable harm. *Id*.

### C. The balance of the equities weighs heavily in favor of Hightower

33. The SPA prohibits Knudsen from using and/or maintaining Hightower's confidential and trade secret information, from soliciting or contacting Hightower's clients, or competing against Hightower for a specific period of time. Knudsen was heavily compensated in exchange for these promises. Additionally, federal law (the DTSA) prohibits Knudsen from misappropriating Hightower's trade secrets. Therefore, enjoining Knudsen as requested will simply put him in the position he agreed to be in when he sold a stake in his business to Hightower. On the other hand, Hightower will continue to suffer irreparable harm if Knudsen's unlawful conduct is not enjoined. While Hightower has been able to uncover evidence of this through its own internal investigation, the full extent of Knudsen's wrongful conduct and Hightower's resulting damages are unknown.

34. The balance of equities strongly favors Hightower. Hightower seeks only injunctive relief that comports with the bargained for restrictions to protect its legitimate business interests. There is nothing inequitable in such an endeavor. *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *20. "When the fact of competition is established, the rule of law is clear that, on application of the injured purchaser of the business, equity will enjoin the continued breach of the restrictive

covenant. Equity, almost as a matter of course, gives relief in such actions on the ground that the remedy at law is inadequate." *Tull*, 147 A.2d at 663.

35. Knudsen's current, unrestrained course of action is causing severe damage to Hightower through loss of customer relationships, confidentiality of customer information, business goodwill, office stability, and deprivation of the benefit of Hightower's bargain for its acquisition of Knudsen's business.

36. Comparatively, Knudsen would suffer no hardship from the entry of a temporary restraining order, as an order requiring him to abide by his contractual obligations would be consistent with the contracts he negotiated with Hightower. Accordingly, the balance of harms weighs heavily in Hightower's favor. A temporary restraining order is necessary to prevent Knudsen and those acting in concert with him from using Hightower's Confidential Information to unfairly compete against Hightower.

### III. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court issue a temporary restraining order consistent with Plaintiff's proposed order.

Dated this 28th day of March, 2024

Respectfully submitted,

**HENNEMAN RAU KIRKLIN & SMITH LLP**

By: /s/ *Matthew B. Henneman*
Matthew B. Henneman
Texas State Bar No. 00790865
Federal ID No. 21661
Scott D. Smith
*Admitted Pro Hac Vice*
Texas State Bar No. 24011874
Federal ID No. 2237469
815 Walker Street, Suite 1440
Houston, Texas 77002

Phone: 713-955-6030
Fax: 713-955-6141
Email: mhenneman@hrkslaw.com
Email: sdsmith@hrkslaw.com

**ATTORNEYS FOR PLAINTIFF,
HIGHTOWER HOLDING, LLC**

**CERTIFICATE OF SERVICE**

I certify that on March 28, 2024, a true and correct copy of the foregoing document was served on all counsel of record via this Court's ECF system.

*/s/ Matthew B. Henneman*